ARTHUR J. HUMPHREYS, INC.

v.

UNITED STATES.

C. D. 4588; Court Nos. 70/55211 and 70/55224.

United States Customs Court.
March 18, 1975.

---

Glad, Tuttle & White, San Francisco, Cal. (George Tuttle and John R. McDougall, San Francisco, Cal., of counsel), for plaintiff.

Irving Jaffe, Acting Asst. Atty. Gen. (Andrew P. Vance and Robert B. Silverman, New York City, trial attys.), for defendant.

FORD, Judge:

The merchandise covered by this consolidated action consists of western red cedar fence sections, fence posts, gates, corner adaptors and cleats. The fence sections identified on the invoices as 4 x 8 and 5 x 8 western weave, 5 x 8 and 6 x 8 stockade, 5 x 8 townhouse, crisscross sections and the formal gates and stockade gates of various sizes were all assessed with duty at the rate of 11.5 per centum ad valorem under item 207.00, Tariff Schedules of the United States, as modified by Presidential Proclamation 3822, T.D. 68–9, as "Articles not specially provided for, of wood."

The fence posts, corner adaptors, and cleats were classified by customs under item 202.54, Tariff Schedules of the United States, as modified by Presidential Proclamations 3694 and 3813, T.D.'s 66–9 and 67–267, as other lumber whether or not drilled or treated and assessed with duty at 5 per centum ad valorem.

Plaintiff contends the fence posts are entitled to entry free of duty under item 200.60, Tariff Schedules of the United States, and the balance of the merchandise under item 200.75, Tariff Schedules of the United States, as wood fence pickets, palings and rails, whether or not assembled into fence sections.

The pertinent portions of the statutory provisions involved herein and their headnotes read as follows:

Tariff Schedules of the United States:

*Schedule 2.—Wood and Paper; Printed Matter*

Part 1.—Wood and Wood Products

\*    \*    \*    \*    \*    \*    \*    \*    \*

Subpart A.—Rough and Primary Wood Products; Wood Waste

*Subpart A headnotes:*

\*    \*    \*    \*    \*    \*    \*    \*    \*

2.  The provisions for wood products in items 200.60 (poles, piles, and posts), 200.65 (laths), 200.75 (fence pickets, palings, and rails), 200.80 (railroad ties), and 200.85 (shingles and shakes) cover such products whether or not they have been treated with creosote or other wood preservatives.

\*   \*   \*   \*   \*   \*   \*   \* . \*

200.60   Wood poles, piles, and posts ....................    Free

\*   \*   \*   \*   \*   \*   \*   \*   \*

200.75   Wood fence pickets, palings, and rails, whether or not assembled into fence sections ............    Free

\*   \*   \*   \*   \*   \*   \*   \*   \*

### Subpart B.—Lumber, Flooring and Moldings

*Subpart B headnotes:*

1. This subpart covers lumber, wood siding, wood flooring, wood moldings, and certain wood carvings and ornaments, including such products when they have been drilled or treated.

2. For the purposes of this part, the following terms have the meanings hereby assigned to them:

\*   \*   \*   \*   \*   \*   \*   \*   \*

(d) *Drilled or treated:* Drilled at intervals for nails, screws, or bolts, sanded or otherwise surface processed in lieu of, or in addition to, planing or working, or treated with creosote or other wood preservatives, or with fillers, sealers, waxes, oils, stains, varnishes, paints, or enamels, but not including anti-stain or other temporary applications mentioned in headnote 4 of this subpart.

\*   \*   \*   \*   \*   \*   \*   \*   \*

4. The treatment of lumber or other products provided for in this subpart with anti-stain or other temporary applications which serve only for the purpose of maintaining the products in their rough, dressed, or worked condition until installation or further manufacture shall not affect their classification under any of the provisions of this subpart.

\*   \*   \*   \*   \*   \*   \*   \*   \*

Lumber and wood siding, drilled or treated; and edge-glued or end-glued wood not over 6 feet in length or over 15 inches in width, whether or not drilled or treated:

\*   \*   \*   \*   \*   \*   \*   \*   \*

202.54   Other ...................................    5% ad val.

\*   \*   \*   \*   \*   \*   \*   \*   \*

### Subpart F.—Articles Not Specially Provided For, of Wood

*Subpart F headnote:*

1. This subpart covers all products of wood which are not provided for elsewhere in the tariff schedules.

207.00   Articles not specially provided for, of wood . . .   11.5% ad val.

The record consists of the testimony of three witnesses called on behalf of plaintiff and the receipt in evidence of nine exhibits. Defendant called two witnesses and introduced nine exhibits in evidence.

Gordon Nanson was the designer of the imported merchandise and handled the manufacture and sale for North Pacific Lumber Company, the ultimate consignee herein. The witness has been in the lumber products industry since 1948 and presently operates a lumber brokerage business. The shipments of fencing in their natural form were as represented by plaintiff's exhibit 4. As the sections were manufactured as early as September and then stored for shipment until the following February and March, the color had deteriorated. In order to overcome this, Mr. Nanson and the president of B. C. Wedge, Ltd. approached Walker Brothers Paint Co. who produced a solution which would help maintain a uniform appearance. The formula thus developed is represented by plaintiff's exhibit 9 with the exception of the phenyl mercuric acetate.

Subsequent to the use of this solution, a second problem developed in the form of green mold. Walker Brothers Paint Co. then developed an additive to the solution already used, i.e., phenyl mercuric acetate to suppress the growth of the green mold.

Lawrence Storey of Walker Brothers Paint Co. testified he developed a solution which controlled water marking and which retarded the leaching action which is normally associated with the aging of cedar. This treatment produced a color similar to plaintiff's exhibit 3. The problem of green mold subsequently encountered resulted in the experimentation with five or six formulas being developed in collaboration with Western Forest Products Laboratory. The final formula is that contained in plaintiff's exhibit 9. The color imparted to the material was similar to plaintiff's exhibits 1 and 2.

Mr. Storey agreed with the definition of wood preservative contained in the book *Wood Preservation* by Hunt and Garrett which states as follows:

Wood preservatives are chemical substances that, when suitably applied to wood, make it resistant to attack by fungi, insects, or marine boras.

In his opinion the definition describes the treatment of the western red cedar with the formula he developed as it controlled biological mold growth. Stains may be either transparent or opaque using a linseed oil creosote or latex base. A stain is a preservative to the extent that it prevents degradation of the wood caused through ultraviolet light.

A linseed oil or creosote stain, according to the witness, would constitute a certain amount of water repellency and tend to prevent or retard leaching of extractives by water whereas the stain involved herein would only nominally do so because the film is very thin. The stain developed was a concentrate which was to be diluted with five parts of water. The solution was stored in a large tank and the various sections were hand-dipped, drained and dried. The witness agreed with the definition of preservative contained in the *U.S. Department of Agriculture Handbook 27* published by Forest Products Laboratory which provides as follows:

Any substance that for a reasonable length of time is effective in preventing the development and action of wood-rotting fungi, boras, of various kinds, and harmful insects that deteriorate wood.

Mr. Storey was of the opinion the formula involved is a preservative because it controlled biological growth, i.e., mold, to acceptable levels. The pigment added also absorbed ultraviolet light which prevented the breakdown of wood cells and hence acted as a preservative.

Dr. Harvey Erickson, a professor of wood science and technology at the University of Washington, testified that a

wood preservative is a substance with the capability to protect wood from deterioration caused by various forms of attack such as fungi, insects and marine boras as well as bacterial deterioration including micro-organisms and physical and chemical deterioration.

Dr. Erickson testified that preservation means to maintain intact or to protect the integrity of wood. A definition which does not mention bacteria is an old definition. A wood preservative, according to Dr. Erickson is a chemical which prolongs the surface life of wood products, protecting the wood from degradation through biological, physical or chemical agents. The formula developed by Mr. Storey is an example of a wood preservative within the understanding of Dr. Erickson. Growth of green mold is a form of wood deterioration as is color change.

Dr. Steven Fike, a chemist with the U.S. Customs Laboratory at San Francisco, testified that he made an analysis of the components of plaintiff's exhibit 9. The formula in his opinion is a polyvinyl latex stain with phenyl mercuric acetate. The latter in the formula prevents the growth of fungi. The burnt umber and red oxide in the formula act to block out ultraviolet light and protect against deterioration as well as adding color. Dr. Fike further testified as to the properties of western red cedar and as to various experiments performed by him with the solution.

Mr. Donald Laughnan is a specialist in coating for the Simpson Timber Co. He spent 22 years with the U.S. Forest Products Laboratory. The witness testified as to the qualities of western red cedar. He did not believe plaintiff's exhibit 3 was treated with a solution which met the definition of a preservative as contained in the wood handbook. The percentage of the phenyl mercuric acetate is not, in his opinion, sufficient to protect against wood-rotting fungi, boras or harmful insects.

Based upon the record and the admission by defendant in its answer with respect to paragraph 7, there is no issue as to whether the imported articles are fencing and posts. Defendant however contends the fence sections particularly the western weave, exhibit 1, and stockade, exhibit 2, as well as the gates, cleats and corner adaptors, are not within the ambit of item 200.75, *supra*, which provides for "fence pickets, palings, and rails." Additionally defendant contends that the so-called "treatment" of the wood does not constitute a preservative since it also contains pigment which colors or helps maintain its original color.

While the parties have devoted themselves both in the trial and briefing of this matter to the question of whether or not the solution utilized in Canada was a wood preservative, the first question to be considered is whether the imported articles are within the scope of the claimed provisions. Item 200.60, *supra*, includes posts. Defendant does not contend and I so find that the posts are provided for in said item if the so-called "treatment" does not preclude classification therein. Insofar as the fence sections, cleats, corner adaptors and gates are concerned, a more complex situation is presented. This provision, item 200.-75, provides for fence sections.

In order to determine the legislative intent and meaning of the terms utilized, the court may resort to legislative history to ascertain the intent. *Harrison* v. *Northern Trust Co.*, 317 U. S. 476, 63 S.Ct. 361, 87 L.Ed. 407 (1943); *American Express Company* v. *United States*, 426 F.2d 383, 57 CCPA 100, C.A.D. 985 (1970). The Tariff Classification Study covering schedule 2, part 1, insofar as pertinent makes the following statement in its explanatory notes:

Item 200.60 which provides for poles, piles, and posts of wood, free of duty, is derived from paragraphs 401, 1803(1) and (2), and 1804. Certain piles of fir, spruce, pine, hemlock, and larch are dutiable under paragraph 401 at 50 cents per thousand feet,

board measure, as are round timbers used for spars or for building wharves. Other piles are duty free under paragraph 1803(2), round timber, not specially provided for, and poles and posts are duty free under paragraphs 1803(1) and 1804. The present duty of 50 cents per thousand feet, board measure, imposed on certain piles under paragraph 401 is negligible (equivalent to about 0.7 percent ad valorem). Wood poles are long, slender, round timbers set upright in the ground used to support cables or wires for transmitting electric power or communications. Wood posts are round, sawed, or split stems of trees commonly 4 to 5 inches in diameter and 6½ to 7 feet long. Posts are used chiefly as fence posts for farm, highway, and railroad fencing. Wood piles are heavy round timbers, which are pointed and driven in the ground to form a foundation. Piles are used in building structures such as piers, wharves, and bridges, and as foundation piles where the timber is cut off at the ground line or below to support the foundations of large structures.

\* \* \* \* \* \*

Item 200.75 would provide for the free entry of wood fence pickets, palings, and rails, whether or not assembled into fence sections. This provision, which is based upon paragraph 1805, would be limited to materials which had been so processed physically as to dedicate them in a practical, commercial sense to fence construction, and would not include lumber merely cut to length. Pickets (or palings) are narrow pieces of wood used as uprights in the fabrication of wood fences. Sawed pickets are commonly 1 by 2½ or 3 inches wide, by 3 to 4 feet in length with pointed tops. Rustic pickets consist of round or half round stakes pointed or unpointed, commonly from 1 to 3 inches

in diameter and 4 to 8 feet long. Wood fence rails are long and slender, may be round, half round, quarters or rectangular in cross section, generally not exceeding 4 inches in diameter or width and approximately 8 feet in length. Rails are also used as horizontal members in fabricating post and rail-type fences.

■ Based upon the foregoing, the gates, cleats and corner adaptors would appear to fall within item 200.75 by virtue of the explanation that the provision is "limited to materials which have been so processed physically as to dedicate them in a practical, commercial sense to fence construction, and would not include lumber merely cut to length." All of these articles are dedicated to fencing purposes.

The explanation of what constitutes pickets, palings and rails set forth, *supra*, when considered with the construction of the imported merchandise appears to embrace the imported fence sections. Defendant's exhibits A and B offered to indicate how the merchandise was held out for sale by the importer clearly depict the construction as composed of pickets and rails. The western weave is made of weaving rails and bottom and side rails. The stockade is made of pickets and rails. The townhouse is made of vertical pickets and top, bottom and side rails. The crisscross is made of top, bottom and side rails and palings. Accordingly, based upon the exhibits and the legislative history I am of the opinion that the fence sections involved herein are within the purview of item 200.75, *supra*, if the so-called "treatment" does not remove them therefrom.

Headnote 2 of schedule 2, part 1, subpart A, covers articles provided for in item 200.75, *supra*, "whether or not they have been treated with creosote or other wood preservatives." The imported articles have not been treated with creosote but they have been treated with a

product containing the following as set forth in plaintiff's exhibit 9:

18–604 B. C. WEDGE CONCENTRATE

| | | |
|---|---|---|
| Water | 1875 | Lbs. |
| Nopco NDW (Bubble Breaker) | 20 | " |
| Tamol 731 (Wetting Agent) | 145 | " |
| Methocel DG (Protective Colloid) | 15 | " |
| Hexylene Glycol | 175 | " |
| Burnt Umber (Synthetic) | 1250 | " |
| Red Oxide (Synthetic) | 100 | " |
| Phenyl Mercuric Acetate (Fungistat) | 50 | " |
| Poly Vinyl Acetate Emulsion | 2125 | " |

Yield: 450 Imperial Gallons
Thin with 5 parts of Water by Volume

■ Based upon the formula and the record, it is apparent the product in said exhibit 9 is a polyvinyl acetate paint with the addition of a fungistat or mildewcide. In its diluted state, which is the condition in which it was applied to the imported products, it would be a stain or similar to a stain with a fungistat or mildewcide. The testimony establishes insofar as the addition of the pigment is concerned that it blocks out the ultraviolet rays which tend to cause deterioration of the wood. The fungistate or mildewcide is recognized as preventing the growth of fungus, in this instance, green mold. Defendant contends that only preservatives such as creosote which are unpigmented were intended to be included. To bolster this contention defendant relies upon headnotes 2(d), the definition of treated, and 4 (antistain) of schedule 2, part 1, subpart B, as well as some of the testimony presented before the Tariff Commission. The reliance by defendant on the headnotes of subpart B is misplaced. The mere fact the distinction was drawn between coating, painting, staining, etc., in subpart B, confirms the position that if applicable to subpart A, the framers would have or should have utilized the same or similar language. The intent to limit the language to subpart B is clear as indicated in the Explanatory Notes to the Tariff Classification Study in which the following statement is made:

The term "drilled or treated" has been defined in headnote 2(d) for convenience in connection with certain rate descriptions in this subpart. Sometimes lumber, wood siding, flooring, and moldings are advanced in condition by being drilled at intervals to facilitate their installation with nails, screws, bolts, or similar fasteners, by sanding or other surface processing in lieu of, or in addition to, planing or working, or by treatment with creosote or other wood preservatives, or with fillers, sealers, waxes, stains, paints, etc. These products have been classified in the "basket" provision for wood manufactures in paragraph 412 at the rate of 16⅔ percent ad valorem; and in the overall "basket" provision for nonenumerated manufactures in paragraph 1558. The classification results are uncertain and anomalous. The representative of the domestic producers appearing at the hearing called attention to the problem and recommended the establishment of a firm provision for lumber and wood siding at a rate between the very low rates for lumber in paragraphs 401 and 1803(1) and IRC section 4551(1) and the relatively high rate in paragraph 412. In the circumstances, a provision has been added (item 202.54) reflecting the rate (10 percent ad valorem) currently applied to some of these products under paragraph 1558.

■ The statements of witnesses and the Assistant General Counsel before the Tariff Commission do not constitute an intent to exclude acknowledged preservatives which contain a pigment. The use of pigment does not per se convert an article provided for in subpart A into an article provided for in subpart B. Headnote 1 of subpart B indicates said subpart covers lumber, wood siding, wood flooring, wood molding, wood carvings, etc. It is also apparent by reviewing items 202.52, 202.53, 202.-54, Tariff Schedules of the United States, that the unit of quantity is "M. bd. ft." while the imported articles are sold by sections.

The Summaries of Trade and Tariff Information, Schedule 2, Volume 1, defines board foot measure at page 81 as follows:

> Lumber is measured by the board foot, a three-dimensional unit; for tariff purposes,

> a board foot is the quantity of lumber contained in, or derived (by drying, dressing, or working, or any combination of these processes) from, a piece of rough green lumber 1 inch in thickness, 12 inches in width, and 1 foot in length, or the equivalent of such piece in other dimensions.

In the same source at page 52, the following comment is made:

> Posts and rails are usually sold by the piece, although they are sometimes sold in unassembled lots consisting of the exact number required for a given length of fence. Lath is usually distributed in bundles of 50 pieces each. Pickets (or palings) are distributed both in unassembled lots and in the form of assembled fencing section or panels.

It is obvious from the foregoing that for tariff purposes as well as in the trade lumber is sold per M. bd. ft. while posts are sold by the piece. Therefore the addition of a pigment does not convert a post to lumber for tariff purposes or in the trade and commerce of the United States. The addition of a pigment in a fungistat or mildewcide does not convert a fence section treated with it into an article not specially provided for of wood as prescribed by item 207.-00, *supra*.

It is evident that item 200.75, *supra*, is more specific and would prevail over the basket provision of item 207.00, *supra*, under which fence sections, gates, etc., were classified. I am of the opinion that the fence sections, posts, gates, corner adaptors and cleats which were treated with a pigmented preservative are properly dutiable as claimed.

Judgment will be entered accordingly.